**JULIE R. PATTEN**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**2601 2nd Avenue North, St. 3200**
**Billings, Montana 59101**
**Phone: (406) 657-6101**
**FAX: (406) 657-6058**
**E-mail: Julia.Patten@usdoj.gov**

**ATTORNEY FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>vs.<br><br>**JAREN MICHAEL STENNERSON,**<br><br>**Defendant.** | **CR 22-139-BLG-SPW**<br><br><br>**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDICTMENT** |

Jaren Stennerson is charged in a two-count indictment with unlawful user of

a controlled substance in possession of a firearm, in violation of 18 U.S.C. §

922(g)(3) and receipt of firearm while under indictment, in violation of 18 U.S.C. §

922(n). Stennerson now moves to dismiss both counts of his indictment arguing

1

that 18 U.S.C. §§ 922(g)(3) and 922(n) are unconstitutional after the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Doc. 21, 22. Stennerson also argues that § 922(g)(3) is unconstitutionally vague, on its face and as applied. *Id.*

Stennerson's claim fails because the Second Amendment's protections do not extend to the possession of firearms by unlawful users of controlled substances, or those pending felony charges. Both § 922(g)(3) and § 922(n) fall within the nation's long-standing tradition of disarming citizens who engage in criminal activity, those with mental impairments, or those who were otherwise deemed dangerous.

Finally, Stennerson cannot show that § 922(g)(3) is unconstitutionally vague as applied to him because his routine and prolonged use of methamphetamine was contemporaneous to his gun possession which put him on notice he was an "unlawful user." Because his challenge does not pertain to a First Amendment right, he cannot maintain a facial challenge for vagueness under Ninth Circuit precedent.

## ARGUMENT

The Second Amendment states that it is "the right of the people to keep and bear Arms" and that right "shall not be infringed." U.S. Const. Amend. II.

However, that right is not unlimited. *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).

The Supreme Court has recognized that the Second Amendment allows a "variety" of firearms regulations. *Heller*, 554 U.S. at 636. The Supreme Court has stressed that its decisions apply to "law-abiding, responsible citizens" and do not "cast doubt on longstanding prohibitions of the possession of firearms by felons." *Heller*, 554 U.S. at 626, 635.

While the Supreme Court's recent decision in *Bruen* defined the framework for analyzing Second Amendment challenges, it did not abrogate long-standing legal precedent or the regulatory prohibitions of certain persons possessing firearms. *Bruen* analyzed the constitutionality of a New York firearm licensing scheme where an applicant had to show "proper cause" in order to obtain a license to carry a handgun for self-defense. 142 S. Ct. at 2123. The Court held the New York statute violated the Second Amendment because it allowed officials to restrict "law-abiding citizens" from exercising a fundamental right. *Id*. at 2156. In doing so, the Court defined the analytical framework for determining whether a firearm regulation is constitutional. The *Bruen* framework established that courts must assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. *Id*. at 2131. First, the court must

3

determine if the Second Amendment's plain text covers an individual's conduct. *Id*. at 2126. If it does not, the analysis ends, and the regulation is deemed valid. *Id.*   If the conduct is covered by the Amendment's text, the conduct is presumed protected.   *Id.*   The government must then demonstrate that the regulation, in this case a firearms regulation impinging on a Second Amendment right, is consistent with "this Nation's historical tradition."   *Id*.   Drawing on that tradition, *Heller* recognized, and *Bruen* reiterated, that the right to bear arms belongs only to "law-abiding, responsible citizens." *Id*. at 2131 (*quoting Heller*, 554 U.S. at 635).

The Court's decision in *Bruen* did not undermine its precedent in *Heller* or *McDonald v. City of Chicago*, 561 U.S. 742 (2010).   The Court applied "[t]he test we set forth in *Heller*" but made it "more explicit."   142 S. Ct. at 2131, 2134. The *Bruen* Court noted that this analogical inquiry required that the government need only "identify a well-established and representative historical *analogue*, not a historical *twin*."   *Id*. at 2133.   "Even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."   *Id*. at   2118.

Stennerson argues that both §§ 922(g)(3) and 922(n) impermissibly infringe upon his Second Amendment rights. Doc. 22 at 2. He also argues that § 922(g)(3)

violates his Fifth Amendment right because it is unconstitutionally vague on its face and as applied. He faces a heavy burden: "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

*Bruen* has not overruled precedent.   Binding precedent may be deemed overruled only "where the reasoning or theory of" the earlier "authority is clearly irreconcilable with the reasoning or theory of intervening higher authority." *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003).   That "is a high standard." *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1073 (9th Cir. 2018) (citation omitted). "[T]ension" between cases is not enough. *Id*.   Thus, "[s]o long as [a] court can apply . . . prior precedent without running afoul of the intervening authority it must do so." *Id*.   *Bruen* does not come close to meeting that high standard. It merely did away with the "means-end scrutiny" "second step" that courts had applied in some Second Amendment cases.   *Bruen*, 142 S. Ct. at 2125-27.

# I.     Possession of firearms by unlawful users of controlled substances, or those facing felony indictment is not protected by the plain text of the Second Amendment.

The Court need not consider whether § 922(g)(3) or § 922(n) squares with the nation's historical tradition of gun regulation because its modest restriction

burdens no conduct covered by the Second Amendment's plain text. Stennerson

has the burden at this initial stage to show that the Second Amendment covers his

conduct. He cannot carry his burden because "the right to keep and bear arms"

does not cover the possession of firearms by "an *unlawful* user of or addicted to"

controlled substances or an indictee "receiv[ing] guns while under indictment."

A. **An unlawful user of controlled substances is not a "law-abiding, responsible citizen" and thus is not protected under the Second Amendment.**

Section 922(g)(3) criminalizes the possession of firearms by any person

"who is an unlawful user of or addicted to any controlled substance." This

restriction does not run afoul of the Second Amendment, because the right

described by the Second Amendment only extends to "the people" – i.e. "law-

abiding, responsible" citizens keeping or bearing arms for "lawful purposes." *See

Heller,* 554 U.S. at 635; *Bruen,* 142 S. Ct. at 2156. In *Heller,* the Supreme Court

held that "the Second Amendment does not protect those weapons not typically

possessed by *law-abiding citizens* for lawful purposes." 554 U.S. at 625. This

interpretation of the Second Amendment's meaning "accords with the historical

understanding of the scope of the right." *Id.* Further, *Heller* expressly contemplated

that certain citizens were "disqualified" from keeping or bearing arms under the

Second Amendment. *Id.* at 635.

Similarly, *Bruen* repeatedly described the Second Amendment as limited to "law-abiding" citizens. 142 S. Ct. at 2122, 2131, 2133, 2134, 2138, 2150, 2156. The Court has made clear that "the people" described in the Second Amendment are "ordinary, law abiding, adult citizens." *Id*. at 2134. Consistent with that principle, *Bruen* approved "shall-issue" licensing regimes that "require applicants to undergo a background check or pass a firearms safety course."[1] *Id*. at 2139 n.9; *see id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible[.]"). In doing so, the Court had no need to analyze the history of shall-issue licensing regimes. Such regimes generally pass constitutional muster because they "are designed to ensure only that those bearing arms…are, in fact 'law-abiding, responsible citizens.'" *See id*. at 2139 n.9. This reasoning underscores that § 922(g)(3) – which aims to ensure that "those bearing arms" are "law-abiding, responsible citizens" – accords with the Second Amendment. *See id*. Because both *Bruen* and *Heller* define the right to bear arms as belonging to "law-abiding, responsible" citizens, *Heller,* 554 U.S. at 635; *Bruen,* 142 S. Ct. at 2156, or ordinary, law-abiding, adult citizens," *Bruen,*

---

[1] A "shall issue" regime is one in which "authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements." *Bruen*, 142 S. Ct. at 2123. By contrast, a "may issue" regime vests "authorities [with] discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria." *Id*. at 2124.

142 S. Ct. at 2122, 2134, unlawful users of controlled substances fall outside the Second Amendment's protection. In sum, those who habitually, unlawfully use controlled substances are neither "law-abiding" nor "responsible" and therefore are not guaranteed the right to possess firearms under the Second Amendment. Section 922(g)(3) does not burden a constitutional right, and it is facially constitutional.

Moreover, excluding habitual lawbreakers from "the people" as contained the text of the Second Amendment is consistent with scholarly opinions on the subject. As the Ninth Circuit observed in *United States v. Vongxay*,

> [M]ost scholars of the Second Amendment agree that the right to bear arms was "inextricably . . . tied to" the concept of a "virtuous citizen[ry]" that would protect society through "defensive use of arms against criminals, oppressive officials, and foreign enemies alike," and that "the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals) . . . ."

594 F.3d 1111, 1118 (9th Cir. 2010) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)); see also Thomas M. Cooley, *A Treatise on Constitutional Limitations 40* (Boston, Little Brown & Co. 1890) (explaining that constitutions protect rights for "the People" excluding, among others, "the idiot, the lunatic, and the felon"). Accordingly, the plain text of the Second Amendment does not guarantee unlawful users of controlled substances the right to possess a firearm.

Stennerson argues that his possession of firearms, while a habitual drug user,

is protected under the Second Amendment's guarantee. Doc 22 at 5. But,
Stennerson is not part of "the people" whom the Second Amendment protects
because he is not a "law-abiding citizen." In an interview with law enforcement, he
admitted to possessing a firearm and being a methamphetamine addict, using
approximately a "shot a day" of methamphetamine. Gov't Ex. A at 8:57-9:20. As
an admittedly daily user of methamphetamine, Stennerson undoubtedly was
violating federal law at the time he possessed the firearm. Thus, he was not a law-
abiding citizen the Second Amendment protects.

**B.      The right to "keep and bear Arms" does not cover receiving guns
         while under indictment.**

Similarly, Stennerson cannot show that the Second Amendment's text
covers receiving a gun while under indictment. Section 922(n) states: It shall be
unlawful for any person who is under indictment for a crime punishable by
imprisonment for a term exceeding one year to …receive any firearm or
ammunition which has been shipped or transported in interstate or foreign
commerce." In contrast to the ban on gun possession by convicted felons, drug
users, or some other groups, *see, e.g.* 18 U.S.C. § 922(g), § 922(n)'s restriction is
narrow. First, "[b]y its own terms, § 922(n) does not prohibit *possession* of a
weapon by someone under indictment, but only shipping, transportation, or
receipt." *United States v. Laurent,* 861 F. Supp. 2d 71, 85 (E.D.N.Y. 2011). So, it

does not bar a person under felony indictment from continuing to possess any guns he had before the indictment. *Id.* at 85-87. "It merely maintains the *status quo* during the pendency of the indictment, a volatile period during which the stakes and stresses of pending criminal charges often motivate defendants to do violence to themselves or others." *United States v. Khatib,* No. 12-CR-190, 2012 WL 6086862, at *4 (E.D. Wis. Dec. 6, 2012).

Second, unlike the felon-in-possession prohibition, which is permanent, § 922(n)'s restriction "is temporary. It lasts only from indictment to conviction or acquittal." *Laurent,* 861 F.Supp. 2d at 102. "The prohibition ends with dismissal of the charges or acquittal (or conviction for an offense that does not bar gun possession) or becomes permanent if the defendant is, for example, convicted of a felony or a misdemeanor crime of domestic violence." *Khatib*, 2012 WL 6086862, at *4.

The narrow restriction of § 922(n) does not burden "the right to keep and bear arms." In *Heller,* the Supreme Court explained that "the most natural reading of 'keep arms' in the Second Amendment is to 'have weapons.'" 554 U.S. at 582. Section 922(n) does not burden that right because it "does not prohibit *possession* of a weapon." *Laurent*, 861 F. Supp. 2d at 85. Section 922(n) did not impair Stennerson's ability to "keep" any arms he had before his indictment. Rather, he

simply coud not receive new ones during the time he was under indictment., *see* 18 U.S.C. § 922(n)*, conduct the Second Amendment's text does not address. *Cf. Heller*, 554 U.S. at 626-27 (noting that the Court's opinion did not invalidate "laws imposing conditions and qualifications on the commercial sale of arms"); *Nati'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 206 (5th Cir. 2012) (holding that laws did "not severely burden the Second Amendment rights of 18-to-20-year olds because" they did not ban use or possession but "imposed an age qualification on commercial firearm sales").

Similarly, "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584. "When used with 'arms,' however, the term has a meaning that refers to carrying for a particular purpose—confrontation." *Id.* In *Bruen*, the Supreme Court confirmed that "[t]his definition of 'bear' naturally encompasses public carry" in addition to carrying a gun in one's home. 142 S. Ct. at 2134. Section 922(n) does not burden this right either. Unlike the New York licensing law that *Bruen* invalidated—which directly restricted citizens' ability to publicly carry guns they otherwise lawfully possessed—§ 922(n)'s temporary "receipt" restriction does not limit what citizens can do with their lawfully possessed guns.

In some contexts, courts have suggested that the right to keep and

bear arms implies the right to obtain them. *Cf. Nat'l Rifle*, 700 F.3d at 204–05 (assuming, despite being inclined to hold otherwise, that the Second Amendment presumptively protects "the ability of 18-to-20-year-olds to purchase handguns from FFLs"). But nothing about that right implies a right of otherwise unarmed citizens to procure new arms once facing felony charges, but before the charges resolve. Obtaining a gun in that circumstance creates distinct risks because one could reasonably "infer a malevolent intent when an indictee finds it necessary to obtain a gun during the narrow period during which an indictment is pending knowing that he will have to give it up should he be convicted." *Khatib*, 2012 WL 6086862, at *4. Stennerson cannot show that the founders intended for "the right to keep and bear arms" to protect an indictee's right to obtain guns.

### C. The prohibition of drug users and addicts from possessing firearms squares with the nation's historical tradition, as does the restriction on receiving guns while under indictment.

Even if the Second Amendment's plain text covers Stennerson's conduct, his Second Amendment claims fail because both § 922(g)(3) and § 922(n) are "consistent with this Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2126. Under this part of the analysis, courts look to "historical analogies" to the challenged law to determine whether it resembles constitutionally

accepted restrictions. *Id.* at 2132. "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* Among the features that make regulations fit for comparison, is "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. In other words, where a historical and modern regulation impose similar burdens for similar reasons, they are more appropriate for analogy. While certain firearms regulations may have direct analogies to permissible restrictions present at the founding, some comparisons may "require a more nuanced approach" due to "societal concerns or dramatic technological changes." *Id.* at 2132.

The lengthy historical analysis in *Bruen* warns of the various pitfalls in evaluating historical analogues. For example, *Bruen* explains "English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution" and that "it [is] better not to go too far back into antiquity for the best securities of our liberties." *Id.* at 2136. By the same token, the Supreme Court cautioned "against giving post-enactment history more weight than it can rightly bear" when interpreting a constitutional command. *Id.* Lower courts must, therefore, carefully navigate

between the Scylla of antiquity and the Charybdis of recency to determine what the Framers understood the scope of the Second Amendment to be.

To assist courts in this endeavor, *Bruen* highlighted three historical indicators that a firearms regulation was unconstitutional. First, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. at 2131. Second, where the societal problem has historically been addressed by means other than firearms regulation, that may serve as evidence that the challenged regulation is unconstitutional. *Id*. Third, if jurisdictions attempted to enact similar regulations that were rejected on constitutional grounds, "that rejection surely would provide some probative evidence of unconstitutionality." *Id*.

### 1. Historical Analogues to Section 922(g)(3).

As *Bruen* instructs, appropriate historical analogues to Section 922(g)(3) will be similar in "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2132–33. Section 922(g) is a statute that criminalizes the possession of firearms by various classes of people. As explained, "Congress enacted the exclusions in § 922(g) to keep guns out of the hands of

14

presumptively risky people" including unlawful drug users and addicts. *See United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010). A review of early colonial laws has not revealed any statutes that prohibited possession by unlawful drug users—likely due to the recency of public laws concerning drug-use and addiction. Nevertheless, appropriate historical analogues will likely be regulations that disarm individuals based on their unlawful behavior or impaired judgment. Indeed, the two most readily analogous firearms regulations are those that prohibit the possession of firearms by felons and those that prohibit possession by the mentally ill. *Id*. at 684–685.

Unlawful users of controlled substances, like felons, have engaged in criminal behavior. "[By prohibiting possession by felons,] Congress sought to rule broadly—to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." *Scarborough v. United States*, 431 U.S. 563, 572, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977) (internal quotation marks omitted). Similarly, the congressional intent in passing § 922(g)(3) was "to keep firearms out of the possession of drug abusers, a dangerous class of individuals." *United States v. Cheeseman*, 600 F.3d 270, 280 (3d Cir. 2010). Due to their willingness to engage in unlawful activity, Section 922(g) identifies both classes as being "presumptively risky" and unfit to possess

15

firearms. But an unlawful user of a controlled substance may, in many cases, be proven to have greater contempt for the law than a mere felon because they will typically exhibit criminal behavior—i.e., drug use—that is "consistent," "prolonged," and "contemporaneous" with the possession of firearms. *See United States v. Purdy*, 264 F.3d 809, 812 (9th Cir. 2001). Nevertheless, the historical treatment of felons under the Second Amendment is a close analogy to that of unlawful drug users. *See Bruen*, 142 S. Ct. at 2133 (requiring "historical analogue, not a historical twin.").

A robust discussion of the historical basis for prohibiting felons from possessing firearms is found in *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010). There the Seventh Circuit cited a report of the Pennsylvania ratifying convention, in which Pennsylvania's dissenters proposed amendments to the new Constitution. *Id*. at 640. The report has been positively cited by the Supreme Court in *Heller* as a "highly influential" "precursor" to the Second Amendment. 554 U.S. at 604. "The report asserted that citizens have a personal right to bear arms 'unless for crimes committed, or real danger of public injury.'" *Skoien*, 614 F.3d at 640. The Seventh Circuit also observed "[m]any of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime." *Id*. (citing Stephen P. Halbrook, *The Founders' Second Amendment 273*

(2008)). In light of this history, the Seventh Circuit determined that "some categorical disqualifications are permissible" under the Second Amendment. *Id*. at 641.

This conclusion generally aligns with the historical practice of disarming people the Framers deemed to be dangerous or untrustworthy, such as those unwilling to swear an oath of allegiance to the colonies or the states, slaves, freed blacks, and native Americans. *See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST REV. 139, 157–60 (2007); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506–08 (2004) ("The law demonstrates that in a well-regulated society, the state could disarm those it deemed likely to disrupt society."). Although many of these laws were motivated, at least in part, by racial animus, they are nevertheless quintessential features of "this Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2126.

Regulations concerning unlawful users of controlled substances are also analogous to regulations prohibiting the possession of firearms by the mentally ill.

17

It should be uncontroversial that both classes consist of people who may present diminished mental capacity or impaired judgment.[2] *Yancey*, 621 F.3d at 685 (observing "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms.").

Colonial society at the time of the founding did not view persons with mental illness as being among those who could bear arms without "real danger of public injury." *Skoien*, 614 F.3d at 640. "[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry," which did not include individuals with a history of mental illness. *Yancey*, 621 F.3d at 684–85; see also Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 Okla. L. Rev. 65, 96 (1983) ("Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded infants, idiots, lunatics, and felons [from possessing

---

[2] Title 27 C.F.R. § 478.11(a), containing the companion regulations to Section 922, defines "mental defective" as those determined, "as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease: [i]s a danger to himself or to others; or (2) [l]acks the mental capacity to contract or manage his own affairs." The Code defines that an "unlawful user of or addicted to any controlled substance" as "[a] person who uses a controlled substance and has lost the power of self-control with reference to the use of controlled substance; and any person who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician." 27 C.F.R. § 478.11(a)

firearms].""). Such individuals were often removed from the community at large through home confinement or involuntary commitment to welfare and penal institutions. *See, e.g.,* Gerald N. Grob, *The Mad Among Us: A History of the Care of America's Mentally Ill* 5-21, 29, 43 (1994). Moreover, "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad'" Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L. J. 1371, 1377 (2009). These historical realities strongly suggest that the Framers did not understand the Second Amendment to guarantee those with mental illness the unqualified right to possess a firearm.

Critically, *Heller* held that the "longstanding prohibitions on the possession of firearms by felons and the mentally ill" comport with the Second Amendment, which only protects the "right of law-abiding, responsible citizens" to possess a firearm. *Heller's* commentary is not mere dicta. *Vongxay*, 594 F.3d at 1115. Indeed, the Supreme Court has repeatedly assured the presumptive validity of such laws under its Second Amendment holdings. *McDonald*, 561 U.S. 742, 786 (2010).

*Bruen* did nothing to disturb the decision in *Heller*. It only reiterated that the Second Amendment "is neither a regulatory straight-jacket nor a regulatory blank check." *Bruen*, 142 S. Ct. at 2133. Justice Kavanaugh, joined by Chief Justice

Roberts in a concurring opinion, noted the "presumptively lawful regulatory measures" described in *Heller*, including the "longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . ." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). Moreover, Justice Kavanaugh's concurrence observed that *Bruen* only concerned "may-issue" licensing regimes. *Id*. It did not reach "shall-issue" licensing regimes—which commonly disqualify felons, the mentally ill, and drug users. *Id*. These regimes, Justice Kavanaugh suggests are likely constitutional. *Id*. ("Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so.").

Both history and the Supreme Court's Second Amendment jurisprudence strongly demonstrate that disarming unlawful users of controlled substances is "consistent with this Nation's historical tradition of firearm regulation." Accordingly, even if the plain text of the Second Amendment guarantees a right to possess firearms for unlawful drug users, Section 922(g)(3) is a permissible restriction on that right.

//

//

//

20

2. **Section 922(n)'s restriction on receiving guns while under indictment is consistent with the historical tradition of restricting gun rights of citizens viewed by legislatures as unvirtuous or dangerous.**

Section 922(n) is "distinctly similar" to historical restrictions of substantially restricting the liberty of those credibly accused of wrongdoing. *See Bruen,* 142 S. Ct. at 2131. The constitutional question is not whether § 922(n)'s restriction has existed since the founding. Rather, courts considering present-day gun regulations must "reason[] by analogy." *Id*. at 2132.

As the Ninth Circuit has already recognized, "most scholars of the Second Amendment agree that the right to bear arms was 'inextricably…tied to' the concept of a 'virtuous citizenry' and that, 'the right to bear arms does not preclude laws disarming the unvirtuous citizens.'"   *Vongxay*, 594 F.3d at 1118 (collecting scholarly sources).

Courts relying on this "'virtuous citizen' theory" have thus upheld "modern laws banning the possession of firearms by illegal aliens and juveniles— classes of people who might otherwise show, on a case-by-case basis, that they are not particularly dangerous." *Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019). In *National Rifle*, this Court rejected a Second Amendment challenge to § 922(b)(1) and (c)(1), which restrict the ability of people under 21 to buy handguns, calling that restriction "firmly historically rooted." 700 F.3d at

204. The court explained that the regulation "is consistent with a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety." *Id.* at 203.[3]

Courts have reasoned similarly for other categorical restrictions similar to *Heller's* non-exhaustive list of presumptively lawful regulations. *See, e.g., Yancey*, 621 F.3d at 684–87 (relying on historical evidence to uphold § 922(g)(3)'s prohibition of gun possession by illegal drug users); *United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011) (holding that § 922(g)(8)'s prohibition of gun possession by people under domestic-violence protective orders "is consistent with a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens"); *Skoien*, 614 F.3d at 640 (same for § 922(g)(9)'s prohibition of gun possession by those convicted of misdemeanor crimes of domestic violence); *United States v. Rene E.*, 583 F.3d 8, 16 (1st Cir. 2009) (rejecting a Second Amendment challenge to § 922(x), which restricts the ability of

---

[3] *Bruen* abrogated *National Rifle* to the extent that it held that a gun regulation could survive a Second Amendment challenge under means-end scrutiny, even if it is not consistent with the nation's historical tradition of gun regulation. *See* 142 S. Ct. at 2127 n.4. But this Court was "inclined to uphold the challenged federal laws at step one of [its] analytical framework," *see Nat'l Rifle*, 700 F.3d at 204, which relied on the historical record and was "broadly consistent with *Heller*," *see Bruen*, 142 S. Ct. at 2127. Nothing in *Bruen* abrogates this Court's or other courts' historical analyses, which were typically considered part of "step one" under courts' pre-*Bruen* case law

people under 18 to possess handguns, and explaining "that the founding generation would have regarded such laws as consistent with the right to keep and bear arms"). With limited exception, federal gun regulations uniformly have been upheld in the wake of *Bruen. United States v. Butts,* --- F. Supp.3d ---, 2022 WL 16553037 (D. Mont. October 31, 2022) (collecting cases).

Like the age-based restriction addressed in *National Rifle*, § 922(n) "is consistent with a longstanding tradition of targeting select groups' ability to access … arms for the sake of public safety." *See* 700 F.3d at 203. Section 922(n)'s legislative history shows that, like other categorical restrictions on select groups, it "reflects a concern with keeping firearms out of the hands of categories of potentially irresponsible persons." *Laurent*, 861 F. Supp. 2d at 82 (quoting *Barrett v. United States*, 423 U.S. 212, 220 (1976)) (ellipses omitted). It thus reflects a permissible legislative judgment that felony indictees are among the potentially dangerous or unvirtuous citizens whose gun rights the government may restrict. Even still, its narrow and temporary restriction on receipt burdens far less conduct than the categorical prohibition of possession by other groups, like convicted felons.

Although a person who has been indicted but not convicted is presumed innocent, a legislature's decision to restrict felony indictees' gun access is

consistent with historical public-safety laws. A grand jury has found probable cause to believe that a felony indictee has committed "the most serious category of crime deemed by the legislature to reflect 'grave misjudgment and maladjustment.'" *Medina*, 913 F.3d at 158 (quoting *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017)). And, as noted, there is often good reason to "infer a malevolent intent when" someone responds to being indicted by procuring a gun. *See Khatib*, 2012 WL 6086862, at *4.

At the founding, moreover, a felony indictment foretold far severer consequences for the indictee than the loss of gun rights. The standard punishment for a felony was death. *Medina*, 913 F.3d at 158. ("Capital punishment for felonies was ubiquitous in the late Eighteenth Century and was the standard penalty for all serious crimes." (cleaned up)). It is "difficult to conclude" that the founding generation would have understood those standing accused of capital crimes, and thus facing death if convicted, to enjoy unfettered gun rights. *See id*. To the contrary, those under felony indictment were among the "unvirtuous citizens," *see Yancey*, 621 F.3d at 684–85, whom legislatures could lawfully disarm

Stennerson's claim that §§ 922(g)(3) and 922(n) are not supported by historical tradition fails, and his motion should be denied.

24

**II.     Stennerson cannot carry his heavy burden to show that § 922(g)(3) is unconstitutionally vague.**

Stennerson argues that § 922(g)(3) is unconstitutionally vague on its face and as applied because it fails to properly notify ordinary people of what constitute a violation. His argument fails because § 922(g)(3) is not unconstitutionally vague as applied to the specific facts and circumstances of his case, and under Ninth Circuit precent, facial attacks on statutes fail where an as applied analysis supports denial of a constitutional claim.

The Ninth Circuit has articulated well-established legal standards for analyzing a void-for-vagueness claim. In cases that do not implicate First Amendment freedoms, federal courts should "not consider whether a statute is unconstitutional on its face," but rather, should consider only "whether the statute is impermissibly vague *in the circumstances of this case*." *United States v. Rodriguez*, 360 F.3d 949, 953 (9th Cir. 2004) (emphasis in original), citing *United States v. Purdy*, 264 F.3d 809, 811 (9th Cir. 2004); *United States v. Ocegueda*, 564 F.2d 1363, 1365 (9th Cir. 1977) ("It is now established, however, that in cases not involving First Amendment claims a court may only consider a vagueness challenge on the facts of the case before it."), citing *United States v. Mazurie*, 419 U.S. 544, 550 (1975). Stennerson is limited to an as-applied analysis because his challenge does not implicate First Amendment freedoms. *See Rodriguez,* 360 F.3d

at 953. Accordingly, Stennerson's vagueness challenge cannot be aimed at the statute on its face but must be limited to the application of the statute to the particular conduct charged.

In seeking to have an act of Congress declared unconstitutionally vague, defendants face an uphill battle. Indeed, the Supreme Court, in rejecting a void-for-vagueness argument, held that there is a "strong presumptive validity that attaches to an Act of Congress," and "we have consistently sought an interpretation which supports the constitutionality of legislation." *United States v. National Dairy Products Corp.*, 372 U.S. 29, 32 (1963). The Ninth Circuit, citing *National Dairy Products*, agrees. *United States v. Harris*, 185 F.3d 999, 1003 (9th Cir. 1999) ("The presumption is that a statute is constitutional.").

In other words, "[v]oid for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." *National Dairy Products Corp.*, 372 U.S. at 32-33. A statute will "meet the requirement of 'certainty required by the Constitution if its language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices.'" *Panther v. Hames*, 991 F.2d 576, 578 (9th Cir. 1993), citing *Turf Center, Inc. v. United States*, 325 F.2d 793, 795 (9th Cir. 1963).

The prohibition in § 922(g)(3) bars only those persons who are current drug users from possessing a firearm, and "[i]t is obvious that the tenses used throughout Title IV [including § 922(g) ] were chosen with care." *Scarborough*, 431 U.S. at 570, 97 S.Ct. 1963; *see also United States v. Jackson*, 480 F.3d 1014, 1021 (9th Cir.2007). Every circuit to have considered the question has demanded that the habitual abuse be contemporaneous with the gun possession. *See United States v. Patterson*, 431 F.3d 832, 839 (5th Cir. 2005); *United States v. Augustin*, 376 F.3d 135, 139 (3d Cir.2004); *United States v. Turnbull*, 349 F.3d 558, 561 (8th Cir.2003), *vacated on other grounds*, 543 U.S. 1099, 125 S.Ct. 1047, 160 L.Ed.2d 993 (2005) (finding *Booker* error), *reinstated*, 414 F.3d 942 (8th Cir.2005); *United States v. Jackson*, 280 F.3d 403, 406 (4th Cir.2002); *United States v. Purdy*, 264 F.3d 809, 812-13 (9th Cir.2001). Thus the gun ban extends only so long as Stennerson abuses drugs.

The resolution of this challenge "turns on whether the language" of Section 922(g)(3) put Stennerson "on notice that his conduct was criminal." *Purdy*, 264 at 811. Section 922(g)(3) provides "It shall be unlawful for any person…who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802))…to…possess in or affecting commerce, any firearm…" 18 U.S.C. § 922(g)(3). In *Ocegueda,* the Ninth Circuit

stated the term "unlawful user" is "a common sense meaning of the phrase" that included Ocegueda's conduct because his heroin use was consistent, "prolonged," and contemporaneous with his firearms purchases. 564 F.2d at1365-66. In *Purdy,* the Court emphasized that the government must prove the defendant took drugs with regularity, over an extended period of time, and contemporaneously with his purchase of possession of a firearm. 264 F.3d at 813.

In this case, the evidence that would be presented at trial would stem from not only his pending state criminal charge, but also his admissions to law enforcement following his arrest.[4] Stennerson's pending felony charge of criminal possession of dangerous drugs stemmed from an incident in 2018 where he possessed methamphetamine. *See* Gov't Ex. B. In the present case, a day after he was found in possession of a firearm, Stennerson admitted to being a methamphetamine addict that used a "shot of" methamphetamine every day. *See* Gov't Ex. A. Not only was there contemporaneous and consistent use, but there was also prolonged use as evident by the 2018 possession charge. His regular, prolonged, and contemporaneous drug use was sufficient to put him on notice that

---

[4] Both of the as-applied challenges in *Purdy* and *Oceguenda* occurred post-trial, after the government presented evidence that each was an "unlawful user." At this juncture in the proceedings, the government has yet to present any evidence to the trier of fact for Stennerson to argue was insufficient to put him on notice he was an "unlawful user." As such, Stennerson's as-applied challenge is premature.

he fell within the statutory definition of "unlawful drug user."

Defendant relies on a recent District of Utah case – *United States v. Morales-Lopez*, 2022 WL 2355920 – to support his facial challenge that § 922(g)(3) is unconstitutionally vague.[5] However, *Morales-Lopez* at \*2-\*7 makes clear it is arguing for a different standard for a facial challenge than what the Ninth Circuit applies outside the First Amendment.

Section 922(g)(3), as interpreted by the federal courts, is not vague. The Ninth Circuit agrees that the statute requires regular and habitual use at the time of the gun possession. And any uncertainty about the statute's application to a hypothetical defendant's conduct in a marginal case does not render the statute unconstitutionally vague on its face.

## CONCLUSION

*Heller* and *Bruen* are clear that the Second Amendment protects possession and use of firearms for lawful purposes by law-abiding citizens. The Constitution does not protect the conduct §§ 922(g)(3) or 922(n) prohibits.   Moreover, even if such conduct were covered, this statute is consistent with the nation's historical tradition of firearm regulation.   Section 922(g)(3) is facially constitutional, and

---

[5] *United States v. Morales-Lopez* is currently on appeal to the Tenth Circuit Court of Appeals. *See* CA 22-4074.

Stennerson's motion to dismiss should be denied.

DATED this 10th day of January, 2023.

JESSE A. LASLOVICH
United States Attorney


*/s/ Julie R. Paten*
JULIE R. PATTEN
Assistant U.S. Attorney

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule, this certifies that the body of the attached response

contains 6,049 words, excluding the caption and certificate of compliance.

JESSE A. LASLOVICH
United States Attorney


*/s/ Julie R. Patten*
JULIE R. PATTEN
Assistant U.S. Attorney

CERTIFICATE OF SERVICE

L.R. 5.2(b)

* * *

I hereby certify that on January 10, 2023, a copy of the foregoing document and exhibit were served on the following persons by the following means:

| | |
|---|---|
| 1, 2 | CM/ECF |
| _____ | Hand Delivery |
| _____ | Mail |
| _____ | Overnight Delivery Service |
| _____ | Fax |
| _____ | E-Mail |

1. Clerk, U.S. District Court

2. Edward Werner
   Federal Defenders of Montana
   Attorney for Defendant

/s/ Julie R. Patten
JULIE R. PATTEN
Assistant U.S. Attorney